# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| David A. Bardes, individually, as a Taxpayer, and as next friend of his two Minor children, D.A.B. and A.P.B., | ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No.: 2:08-CV-487-PMD-RSC |
| v. | ) ) | |
| John H. Magera, Attorney SCDSS; The State of South Carolina; Charleston County, Vis-à-vis the County Council of Charleston; McRoy Canterbury, Jr., Admin., Charleston County; Kathleen M. Hayes, Director, SCDSS; Odessa Williams, Charleston County DSS, Director; James A. Cannon, Jr., Sheriff of Charleston County; Correct Care Solutions, LLC; The Hon. Wright Turbeville; The Hon. Jocelyn B. Cate; The Hon. Paul W. Garfinkel; Julie J. Armstrong, Charleston County Clerk of Court; Wishart Norris Henninger & Pittman, P.A.; and Wade Harrison, Esq., all individually and in their official capacities. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **ORDER** |
| Defendants. | ) ) ) ) | |

Plaintiff David A. Bardes ("Plaintiff"), appearing *pro se*, filed his 150 page Complaint on February 12, 2008, and his 151 page First Amended Complaint with a 190-page attachment on September 15, 2008, on his behalf and on behalf of his two minor children pursuant to 42 U.S.C. § 1983. Plaintiff alleges that his constitutional rights have been violated, along with other federal statutes and raises pendant state law claims over which the court may have supplemental jurisdiction pursuant to 28 U.S.C. § 1367. He has named the following individuals and entities as Defendants: John M. Magera, an attorney employed as prosecutor by the South Carolina Department of Social Services ("SCDSS"); the State of South Carolina; Charleston County;

Charleston County Council; McRoy Canterbury, Jr., Administrator for Charleston County; Kathleen M. Haynes, Director of the SCDSS; Odessa Williams, Director of the Charleston County Department of Social Services ("CCDSS");[1] James A. Cannon, Jr., Sheriff of Charleston County; Correct Care Solutions, LLC ("CCS"); three South Carolina family court judges—The Honorable R. Wright Turbeville; The Honorable Jocelyn B. Cate, and The Honorable Paul W. Garfinkel—Julie Armstrong, Charleston County Clerk of Court; Wishart, Norris, Henninger & Pittman, P.A. ("WNHP"); and Wade Harrison, an attorney associated with WNHP. Plaintiff sued the individual defendants in both their personal and official capacities, and he seeks damages, as well as equitable relief. All Defendants except for Defendant Sheriff James A. Cannon filed Motions to Dismiss.

This matter is before the court upon Plaintiff's Objections to a United States Magistrate Judge's Report and Recommendation ("R&R") that all Defendants be dismissed from this action, except Sheriff James A. Cannon in his individual capacity. Having reviewed the entire record, including the Plaintiff's Objections, the court the court finds the Magistrate Judge fairly and accurately summarized the facts and applied the correct principles of law. Accordingly, the court adopts the R&R and fully incorporates it into this Order.

## **BACKGROUND**

This matter arises out of a South Carolina family court case wherein Plaintiff was found to be in arrears in his child support for his two minor children. Plaintiff alleges he and his then wife divorced in the state of Pennsylvania and he was ordered to pay child support directly to her. Plaintiff's ex-wife was granted primary placement by the Pennsylvania court, and she moved to Charleston, South Carolina with the children. Plaintiff subsequently moved to

---

[1] Plaintiff voluntarily dismissed Defendant Odessa Williams from his suit on October 9, 2008. Therefore, she is no longer a defendant in this matter.

Charleston to be closer to his children. Plaintiff alleges that on January 21, 2004, SCDSS served him with "a notice of Gross Arrears, a Notice of Registration of the Foreign Support Order for Enforcement, a notice of a scheduled hearing to contest arrears, and a 20-day notice to contest foreign registration." (Am. Compl. at 8.) Plaintiff requested a hearing to contest the registration of the foreign support order. According to Plaintiff, SCDDS attorney Magera "intercepted and/or never riled the motion to contest registration." (Am. Compl. at 12.)

Plaintiff claims that he was threatened, coerced, and ordered to make all future child support payments through the Charleston County Courts. Plaintiff made the payments through the Charleston County Court but was still held in arrears. Plaintiff was advised by SCDSS, apparently by mail, that they would seize his assets, revoke his licenses and passports, and destroy his credit history in letters which Plaintiff refers to as "DSS destroy letters." Plaintiff alleges his creditors began calling and his business credit rating[2] was "shut down." Plaintiff indicates his situation led him to become depressed, anxious, and fearful. Additionally, Plaintiff's vehicle, as well as the recreational vehicle he had been living in, were repossessed. Defendant Magera eventually had Plaintiff's "false arrears' zero balanced" in October 2004, but Plaintiff was not given credit for the overpayments he claims he made. He alleges that Magera violated his First, Fifth, Seventh, Eighth, Ninth, and Fourteenth Amendment rights.

Plaintiff also alleges that he is paying more child support than the South Carolina guidelines require him to pay. Plaintiff has never appealed any of the court rulings of which he complains in this case because he is unable to pay an attorney. Plaintiff's last payment to the Charleston County Clerk of Court, Defendant Julie Armstrong, was made in August 2004, the same month Plaintiff's ex-wife and the minor children moved to North Carolina. The Pennsylvania child support order was registered in North Carolina for enforcement once his ex-

---

[2] Plaintiff was self-employed at the time.

wife moved to that state. Plaintiff moved to North Carolina and found employment but the company eventually went out of business. Plaintiff was found in gross arrears by a North Carolina family court, and as a result he was under "such a strain that he suffered from a five-day period of 'depressive coma' and nearly died." (Am. Compl. at 19.)  The Pennsylvania family court also believed that Plaintiff was in arrears in his child support payments, and Plaintiff alleges that the Pennsylvania court had no records of enforcement from either North or South Carolina.

Plaintiff states he was unable to find any other employment in North Carolina and moved to Clarendon County South Carolina in December 2004. Plaintiff sold his last remaining asset and rented a single-wide trailer. He claims he was mentally disabled with severe depression. He also claims he was unable to find work due to his poor credit rating, and also due to the fact that his resume showed he once was earning $180,000 a year. Plaintiff alleges that employers did not want to hire a person who once worked at the World Trade Center, but was applying for a temporary job at the local library.

Eventually, Plaintiff was served with papers requiring him to attend "Order to Show Cause" hearings in both North and South Carolina. Plaintiff alleges he attended both hearings. Since he had previously received a "zero balance" from the State of South Carolina, but was not given credit for his overpayments, Plaintiff alleges he began to accrue actual arrearages based on an income level he no longer had, and had not had since he lived in Pennsylvania. Plaintiff claims the North Carolina court set the matter aside until South Carolina had ruled on its Order to Show Cause.

Plaintiff requested and was given a hearing in October 2005 in the South Carolina family court before Defendant Judge Wright Turbeville. The judge denied his request for a jury trial and

Plaintiff believes that denial violated his constitutional rights. According to the Complaint, Attorney Magera, representing SCDSS at the hearing, explained to the court that the Pennsylvania support order was initially registered in South Carolina in January 2004. Magera told the court that, at the time, Plaintiff filed a late objection to the registration but the matter was allowed to be heard. The arrearage was struck at that hearing, even though Plaintiff still owed $29,762.70. Magera told the judge that because the arrearage had been set aside there was "no issue" as it pertained to registration. Magera therefore asked the court to dismiss the motion to contest registration, to issue a bench warrant for failure to pay, and order Plaintiff pay through the Clerk of Court. According to the Complaint, the judge ordered SCDSS to obtain Plaintiff's medical records and work out a solution with him. When the order from the October 2005 hearing was entered, it showed Judge Turbeville had ruled that Plaintiff had agreed that he had a duty to support his children; however, the judge was unsure if Plaintiff was able to do so. Plaintiff was ordered to sign a release so that SCDSS could obtain his medical records, including any psychological evaluations that were available.

Plaintiff attended the hearing with a friend, and he alleges that Magera made a verbal threat to the friend after the hearing on Plaintiff's life. Upon returning to Clarendon County, the friend arranged for a four day intensive clinic in Orlando to help Plaintiff, but Plaintiff alleges he continued to fear for his life. Plaintiff indicates he phoned the Governor, the State Attorney General, and then Solicitor Hosington to report "the crime of harassment and stalking, but the calls were never returned."

Plaintiff scheduled a meeting with his psychiatrist when he received the release forms in the mail. The psychiatrist stated it was highly unusual to send a blanket request and that he could not fill out the form without knowing what SCDSS wanted. Nonetheless, Plaintiff complied with

the court order and signed the releases. Plaintiff challenged the order from the court hearing because he did, in fact, contest the registration. Plaintiff agrees that there was to be a determination of his ability to pay child support after all medical records were received, but that no meeting took place between himself and SCDSS. Plaintiff alleges Magera intentionally set another Rule to show Cause hearing and conspired with Defendant Judge Garfinkel to kill him. As a result, Plaintiff contacted the Department of Justice in Washington, D.C., which put him in touch with the Federal Bureau of Investigations. Plaintiff faxed information to the F.B.I. but he did not receive any assistance. He also sent a copy of the same information to the Director of the F.B.I.

Another family court hearing took place in April 2006 in which Plaintiff was sentenced to six months in jail for failure to pay child support. Plaintiff alleges he was locked in a "cold cell" located off the main booking area at the Charleston County Detention Center. According to Plaintiff, the cell has a large refrigeration vent located near the ceiling above the entrance door, and a "booster fan" was located behind the vent to blow "super chilled" air into the cell. Plaintiff states he was locked in the "cold cell" for three days without water, food, bedding, blankets, or the necessary clothing to protect him against hypothermia. His repeated requests for a jacket were denied. Plaintiff then states:

> Within approximately 8–12 hours Plaintiff had fallen into a stage 3 hypothermic shock; Plaintiff had informed a Jailer-Defendant that Plaintiff was hypothermic by stating that his body was unable to shiver to keep itself with heat. Plaintiff asked the Jailer-Defendant to notify the nurse. The Jailer-Defendant replied, 'I will do no such thing.'
>
> Plaintiff suffered tremendous pain, slow loss of use of limbs, violent shivering, painful muscle stiffening, the horror and fright that death was imminent, and the realization that Defendant Magera and Defendant Garfinkel planned his death so quickly and by means of severe hypothermia leading to death by heart failure or brain death, whichever came first.

> Within approximately 8–12 hours, Plaintiff's brain began to shut down, and Plaintiff suffered increasing memory loss until he lost all thought and lost consciousness. Plaintiff slipped into an unconscious hypothermic coma. Plaintiff believed he died.

(Am. Compl. at 97–98.) Plaintiff alleges that Defendant Sheriff "Cannon knew that the cold cell existed as a place of punishment and that prolonged exposure to the elements without protections or duty of care would result in death by hypothermia." (Am. Compl. at 78.)

Plaintiff was removed from the cold cell after the third day by deputies and placed on a mate with a blanket. A subsequent guard shift was unaware of Plaintiff's predicament and beat him because he was unable to stand, move his limbs, or recite his name. Plaintiff claims "they" soon realized something was wrong and took him to the jail's hospital, where he was placed on suicide watch. Plaintiff alleges that he was "wracked with agonizing pain and was suffering from ventricular tachacardia" as his body warmed. (Am. Comp. at 101.)

According to Plaintiff, the next day the doctor "realized that [Plaintiff] was still in danger of death and was in critical conditions" and told Plaintiff that he would get help. An unnamed man tried to get Plaintiff to sign a form, but Plaintiff could not read the form because the jailers refused to give him his glasses. Plaintiff claims the medical staff of CCS filled out a 'refusal' form and left him on the floor of the suicide watch room for six days without a blanket. Plaintiff alleges the guards, Sheriff Cannon, and CCS, the company which employed the medical care personnel who provided medical care at the Charleston County Detention Center, were engaged in a conspiracy to commit murder or involuntary manslaughter, and violated his constitutional rights, as well as state law by not providing him with a blanket and by "torturing" him. Plaintiff admits that he does not know if Judge Garfinkle and Magera gave orders to the jailers to treat him as they did; "[h]owever, the mathematical probability that the Jailer-Defendants just decided on their own accord to execute the plaintiff . . . is deminimus." (Am. Compl. at 103.)

Plaintiff spent 73 days in the Charleston County jail before an attorney helped secure his release pursuant to Plaintiff agreeing to the following: Plaintiff would not sue anyone having to do with the family court case; he would admit he owed child support in arrears and would make a partial payment to reduce the balance, he would seek psychiatric help, and he would leave the state by airplane. Plaintiff's father paid $20,000 to the court. The jail psychologist and Plaintiff's personal psychologist agreed that Plaintiff did not need further treatment. The agreement was sent to Plaintiff at the jail, and Plaintiff alleges he signed it under duress. Plaintiff also argues that the written agreement is "void on several accounts." He maintains the State of South Carolina does not have jurisdiction over him and never did. Additionally, Plaintiff alleges he was not competent to enter into a contract at that time.

At the time this action was brought, it appears there was a pending state court case brought in North Carolina against Plaintiff by his ex-wife for outstanding child support payments. According to the complaint, Plaintiff's ex-wife has retained the firm of Wishart Norris Henninger & Pittman, a named defendant. Plaintiff also named as a defendant Wade Harrison, an attorney with that firm and who represents Plaintiff's ex-wife in the proceedings.

Plaintiff wrote a 190-page book entitled "The Public Trust: Statement of Fact," which he says is the official testimony and evidence for this case and which he attached to his Amended Complaint. He raises multiple causes of action in his Amended Complaint, including, but not limited to, a federal RICO claim, federal criminal charges, claims pursuant to § 1983, state common law claims, such as medical malpractice, negligence, breach of fiduciary duty, defamation, fraud, and extortion.

## STANDARD OF REVIEW

### I.    Standard for Reviewing Magistrate Judge's R&R

The Magistrate Judge only makes a recommendation to the court. It has no presumptive weight, and the court retains the responsibility for making a final determination. *Mathews v. Weber*, 423 U.S. 261, 269 (1976). If a party makes a written objection to a Magistrate Judge's report within ten days of being served with a copy of that report, the court will review the specific objections *de novo*. 28 U.S.C. § 636(b)(1). The court is allowed to accept, reject, or modify the R&R in whole or in part. *Id.* Additionally, the court may recommit the matter to the Magistrate Judge with instructions. *Id. Pro se* complaints are held to a less stringent standard than those drafted by attorneys, *Gordon v. Leeke*, 574 F.2d 1147, 1151 (4th Cir. 1978), and a court is charged with liberally construing a complaint filed by a *pro se* litigant to allow for the development of a potentially meritorious case. *See Hughes v. Rowe*, 449 U.S. 5, 9 (1980). The requirement of liberal construction, however, does not mean the court can ignore a clear failure to allege facts which set forth a claim currently cognizable in a federal district court. *Weller v. Dep't of Soc. Servs.*, 901 F.2d 387 (4th Cir. 1990).

### II.    Legal Standard for a Motion to Dismiss Pursuant to Rule 12(b)(6)

When considering a 12(b)(6) motion to dismiss, the court must accept as true the facts alleged in the complaint and view them in a light most favorable to the plaintiff. *Ostrzenski v. Seigel*, 177 F.3d 245, 251 (4th Cir. 1999). The United States Supreme Court recently stated that "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," a pleading that merely offers "labels and conclusions," or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Likewise, "a complaint [will not] suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancements.'" *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 557).

## ANALYSIS

As discussed above, the Magistrate Judge recommended that all of Plaintiff's claims be dismissed except the claims against Sheriff Al Cannon in his individual capacity, since he did not move to have Plaintiff's claims asserted against him dismissed. Plaintiff objects to this recommendation.

### I.    Plaintiff's Claims Against Governor Mark Sanford

In his Objections, Plaintiff argues that the Magistrate Judge did not even address the claims he asserted against Governor Mark Sanford. In addition to other arguments, Plaintiff contends that Governor Sanford was involved with his child custody case and should be held responsible for any damages Plaintiff suffered since he, according to Plaintiff, "the family courts and the DSS were one of [his] creations that he undertook in his first term." (Objections ¶ 8.) Since Governor Mark Sanford is not a named party to this suit, the court does not address these arguments made by Plaintiff in his Objections.

### II.    Dismissal of Claims Brought on Behalf of Plaintiff's Children

First, the Magistrate Judge addressed the fact that Plaintiff listed himself as a plaintiff, both on his own behalf and as "next friend of his two minor children DAB and APB." He recommended that any claims brought on behalf of Plaintiff's minor children be dismissed,

without prejudice, and that the children be dismissed from the suit since Plaintiff appears before the court *pro se*. Plaintiff objects to this recommendation, arguing that he has been unable to find a lawyer willing to take his children's case because "lawyers cannot sue judges; it is some unearthly rule they follow," and because, as their father, he "has the God given right, also granted in the Preamble of the Constitution, to represent his children's best interest." (Objection ¶ 33.) Plaintiff further argues that a father legally represents his children every day, "with camp contracts and waivers, white water rafting contracts and waivers, school contracts, field trip contracts," etc. (*Id.*) The court agrees with the Magistrate Judge's conclusions. Federal courts have consistently rejected attempts at third-party lay representation." *Herrera-Venegas v. Sanchez-Rivera*, 681 F.2d 41, 42 (1st Cir. 1982). "Although 28 U.S.C. § 1654 gives litigants the right to bring civil claims pro se, courts are nearly unanimous in holding that a parent or guardian cannot sue on behalf of a child without securing counsel." *Gallo v. United States*, 331 F. Supp. 2d 446, 447 (E.D. Va. 2004). Since Plaintiff, appearing *pro se*, is attempting to represent his children, the court dismisses any claims brought on their behalf, without prejudice, and dismisses them from this suit.

## III. Claims for Damages Against the State of South Carolina and the State Defendants in their Official Capacities

The Magistrate Judge concluded that Plaintiff's claims against the State of South Carolina and the State Defendants in their official capacities should be dismissed based on Eleventh Amendment immunity. Plaintiff objects to this recommendation. He contends that "the State of South Carolina has already waived its immunity for itself and for those agents that perform in its behalf, as every federal funding scheme for the States also comes with corresponding limitations, prohibitions, and citizen redress provisions." (Objections ¶ 14.) Plaintiff further asserts that "the various law enforcement, or Executive Branch, agencies and

individuals already waived their objections to being involved in the Judicial Branch with the Plaintiff, as they willfully crossed that line and entered into the judicial branch by coming after Plaintiff." (*Id.*) These objections are without merit.

"The Eleventh Amendment embodies the principle of sovereign immunity and prohibits suit by private parties against states in federal courts unless a state has waived its immunity." *Weller v. Dep't of Soc. Servs.*, 901 F.2d 387, 397 (4th Cir. 1990). Since South Carolina has not consented to suit in federal court, the court dismisses Plaintiff's claims against it. S.C. Code Ann. § 15-78-20(e) ("Nothing in this chapter is construed as a waiver of the state's or political subdivision's immunity from suit in federal court under the Eleventh Amendment . . . ."). Likewise, state officers acting in their official capacities share the state's immunity. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) (holding that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983."). Therefore, to the extent the complaint seeks damages from the Defendants John Magera, Kathleen Hayes, The Honorable Wright Turbeville, The Honorable Joycelyn Cate, The Honorable Paul Garfinkel, and Julie Armstrong in their official capacities, those claims are dismissed, and the court will analyze Plaintiff's claims against each Defendant in his or her individual capacity.

**IV.    Plaintiff's Claims Against Various South Carolina Family Court Judges**

Plaintiff asserts that these Defendants denied him his right of "honest access to the Courts" and his right to a jury trial. He asserts that he has been psychologically and emotionally damaged as a result of incorrect rulings that he was in arrears on the child support payments. Plaintiff contends that Judge Cate violated his right to a jury trial at his March 2, 2005 child support hearing. Judge Cate advised Plaintiff to obtain the advice of an attorney to which Plaintiff responded by repeatedly writing letters to Judge Cate after the hearing. (Am. Comp. 21–

26.) Next, Plaintiff alleges that on October 18, 2005, he appeared before Judge Wright Turbeville for a "mini-trial." Judge Turbeville observed Plaintiff's emotional state and ordered that SCDSS obtain his medical records and sit down with him to attempt to work out a solution to his arrearage issue. (Am. Compl. at 27.) Plaintiff acknowledged that Judge Turbeville attempted to help him and sets forth parts of the transcript from the hearing in his Amended Complaint. Judge Turbeville declined to rule on whether or not Plaintiff was in willful contempt of court without having his medical records and psychiatric record; however, Plaintiff takes issue with Judge Turbeville's request that the DSS attorney, Defendant Magera, prepare an order to obtain these records. (Am. Compl. 64–65.)

Finally, Plaintiff appeared before Judge Garfinkel for consideration of the child support arrearage. He contends that SCDSS conspired with Judge Garfinkel in setting the April 3, 2006 hearing. Plaintiff made the transcript of this hearing part of his Amended Complaint, and it reveals Judge Garfinkel held Plaintiff in contempt. Judge Garfinkel asked about the medical release forms and invited Plaintiff to present a defense. Plaintiff further explained that Judge Garfinkel "zero balanced" his arrearages but failed to give him credit for the child support overpayments that he claims to have made. The Magistrate Judge recommended these claims against The Honorable Wright Turbeville, The Honorable Joycelyn B. Cate, and The Honorable Paul W. Garfinkel in their individual capacity, be dismissed as they are entitled to absolute judicial immunity. (R&R at 22.) Plaintiff objects to this recommendation.

"It has long been settled that a judge is absolutely immune from a claim for damages arising out of his judicial actions." *Chu v. Griffith*, 771 F.2d 79, 81 (4th Cir. 1985). "[J]udges of courts of superior or general jurisdiction are not liable to civil actions for their judicial acts, even when such acts are in excess of their jurisdiction, and are alleged to have been done maliciously

or corruptly." *Stump v. Sparkman*, 435 U.S. 349, 355–56 (1978). "A judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only when he has acted in the clear absence of all jurisdiction." *Id.* Almost all of Plaintiff's complaints against these Defendants arise out of the actions they took against him during proceedings in his family court case. In his Objections, Plaintiff primarily contends that they are not entitled to judicial immunity because they lacked jurisdiction. (Objections ¶¶ 1–2, 4–6.) The court disagrees. The actions of each Defendant were taken in his or her judicial capacity, and none of them acted in the clear absence of all jurisdiction.

Plaintiff also objects on the basis that three states were enforcing the order for him to pay child support, and as such, "this case is that of a Federal question and Federal Court can rule on the proper jurisdiction." (Objection ¶ 3.) Contrary to Plaintiff's assertion, the issue of which state's court has jurisdiction over Plaintiff's child custody case does not invoke the court's federal question jurisdiction pursuant to 28 U.S.C. § 1331. Plaintiff's reliance on *Agg v. Flanagan*, 855 F.2d 336 (6th Cir. 1988) to support his argument that this court has jurisdiction is misplaced. (*See* Objection ¶ 12.) In *Agg*, the Sixth Circuit found that the domestic relations exception to federal jurisdiction does not preclude a federal court from exercising jurisdiction over a claim that the state's method of determining and enforcing child support is unconstitutional and contrary to federal law. *Agg*, 855 F.2d at 339. Plaintiff, however, does not make a similar claim in this case. Rather, Plaintiff clearly challenges the actions taken by the family court judge Defendants during his proceedings before them, including the fact that "Defendants were knowingly, recklessly, and/or negligently acting in various violations of the written law, and/or also knowingly, recklessly, and/or negligently acting in either the total

14

absence of jurisdiction and/or beyond the limits of their jurisdiction, power and authority."
(Objections ¶ 10.) And to the extent Plaintiff seeks redress for any injury allegedly caused by
these Defendants' orders in his child custody proceedings, the Magistrate Judge correctly stated
that the court lacks jurisdiction over those claims pursuant to the *Rooker-Feldman* doctrine,
named after the United State Supreme Court's decisions in *Rooker v. Fidelity Trust Co.*, 263 U.S.
413 (1923) and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983). The
United States Supreme Court recently clarified that this doctrine applies only to "cases brought
by state-court losers complaining of injuries caused by state-court judgments rendered before the
district court proceedings commenced and inviting district court review and rejection of those
judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2006). This is
because federal district courts lack the requisite appellate authority to reverse or modify a state-
court judgment with which Congress empowered only the United States Supreme Court. *Id.* at
292 (citing 28 U.S.C. § 1257 and numerous cases). Thus, a federal district court does not have
jurisdiction to overturn a state court judgment, even when the federal court complaint alleges, as
Plaintiff's does in this case, that the family court judgments violate his federal constitutional
rights. *Davani v. Va. DOT*, 434 F.3d 712, 718–19 (4th Cir. 2006).

    The Magistrate Judge recommended the court dismiss Plaintiff's claim for damages
based on Judge Garfinkel's order that Plaintiff serve time in jail for civil contempt of court. The
Magistrate Judge based this recommendation on *Heck v. Humphrey*, 512 U.S. 477, 486–87
(1994), in which the United States Supreme Court held that, a § 1983 plaintiff who seeks
damages on a § 1983 claim that necessarily implicates the constitutionality of the claimant's
conviction or imprisonment must demonstrate that the conviction or imprisonment has been
overturned, either judicially or by executive order. Therefore, the Magistrate Judge found that

until plaintiff has the finding of contempt or his imprisonment set aside, his claim is barred from consideration by this court. Additionally, any challenge to the fact or duration of his confinement based on Judge Garfinkel's finding of contempt is properly treated as a habeas corpus claim, and Plaintiff is required to first exhaust his state remedies by presenting to the state courts for consideration each issue for which he seeks review in federal court. 28 U.S.C. § 2254. Plaintiff did not object to the Magistrate Judge's recommendation on this matter; thus, the court is not required to give any explanation for adopting these recommendations. *See Camby v. Davis*, 718 F.2d 198, 199 (4th Cir. 1983).

Therefore, based on the foregoing, the court finds that Defendants The Honorable Wright Turbeville, The Honorable Joycelyn B. Cate, and The Honorable Paul W. Garfinkel are entitled to absolute judicial immunity from Plaintiff's claims arising out of actions taken at Plaintiff's various hearings before them. As explained by the Magistrate Judge, Plaintiff's appropriate avenue for relief to challenge the judges' exercise of jurisdiction and orders is through an appeal rather than a suit for money damages against them.

Plaintiff also alleges that he "knows" that Judge Garfinkel was "in" on an alleged "death threat" by Defendant Magera, the DSS attorney handling the child support case. Plaintiff also asserts that Judge Garfinkel might have conspired to have jail officials freeze him to death while at the Charleston County Detention Center, although he admits that he does not know how he would have passed any "cold cell" punishment orders to the jail or whether he even did at all. Since Plaintiff concedes his uncertainty surrounding Judge Garfinkel's involvement with anything that happened to him while incarcerated; and since he only offers the conclusory accusation that Judge Garfinkel conspired to make a death threat to Plaintiff, and since under South Carolina law, Judge Garfinkel would have no authority over the administration of the

Charleston County Detention Center anyway, the court dismisses this claim against Judge Garfinkel as well. *See* S.C. Code Ann. § 24-5-10 ("The sheriff shall have custody of the jail in his county.").

## V.    <u>Plaintiff's Claims Against Kathleen M. Hayes and John H. Magera</u>

Defendant Kathleen M. Hayes is the Director of the South Carolina Department of Social Services and John H. Magera is the attorney for the SCDDS Child Support Enforcement Division. The Magistrate Judge recommended that Plaintiff's claims against these Defendants be dismissed. The Magistrate Judge found that Plaintiff made no allegation that Hayes personally did anything to deprive him of constitutional rights, and to the extent Plaintiff sought to impose respondeat superior theory of liability against her, such a theory is inapplicable in a civil rights action brought pursuant to § 1983. (R&R at 27.) In his Objections, Plaintiff "agrees to her dismissal personally and apologizes to the Court for the error." (Objections at 17.) Thus, the court dismisses Plaintiff's claims against her.

Plaintiff's claims against Defendant Magera stem from his work on behalf of the Child Support Enforcement Agency of SCDSS, and as such, the Magistrate Judge recommended that Plaintiff's claims against arising from his position should also be dismissed because Magera is entitled to absolute prosecutorial immunity, including Plaintiff's claim that Magera conspired with other Defendants to violate his constitutional rights. Plaintiff objects to this recommendation. He contends that "Magera's actions cross into the criminal; so many violations of law that it filled up a 155-page complaint and a 240-page . . . . Stripped of his immunity due to complete lack of jurisdiction, he is wide open for claim for his many actions as an individual." (Objections ¶ 29.) The court disagrees with Plaintiff's objections. In *Imbler v. Pachtman*, the United States Supreme Court held that "in initiating a prosecution and in presenting the State's

case, the prosecutor is immune from a civil suit for damages under § 1983." 424 U.S. 409, 431

(1976). Moreover, in *Weller v. Department of Social Services*, the Fourth Circuit stated the

following:

> Mr. Becker was sued individually and in his capacity as Special Assistant City
> Solicitor and Attorney for the Department of Social Services of Baltimore City.
> Weller alleges that Mr. Becker withheld evidence and offered false evidence
> regarding alleged child abuse to a court in an adjudicatory hearing. Even if such
> allegations are true, they do not state a claim for damages under § 1983, as Becker
> is entitled to absolute immunity for his prosecutorial role.

901 F.2d 387, 397 n.11 (4th Cir. 1990). And in Dory v. Ryan, the Second Circuit stated:

> [A]bsolute immunity protects a prosecutor from § 1983 liability for virtually all
> acts, regardless of motivation, associated with his function as an advocate. This
> would even include, for purposes of this case, allegedly conspiring to present false
> evidence at a criminal trial. The fact that such a conspiracy is certainly not
> something that is properly within the role of a prosecutor is immaterial, because
> the immunity attaches to his function, not to the manner in which he performed it.

25 F.3d 81, 83 (2d Cir. 1994). Based on this, the court dismisses Plaintiff's claims against

Magera arising from his actions as prosecutor for the SCDDS Child Support Enforcement

Division.

As to Plaintiff's claim that Magera made a "death threat" to him through one of

Plaintiff's friends, the Magistrate Judge determined that verbal harassment without allegation of

physical harm resulting therefrom fails to state a constitutional violation. (R&R at 29.) To

support his recommendation, the Magistrate Judge cited to *Collins v. Cundy*, among other cases,

where the Tenth Circuit ruled that verbal harassment or abuse, such as a sheriff laughing at and

threatening to hang an inmate, is not sufficient to state a constitutional deprivation under 42

U.S.C.S. § 1983. 603 F.2d 82, 827 (10th Cir. 1979). Plaintiff objects to this recommendation by

arguing that his claim is different from the circumstances present in *Collins*. Plaintiff contends

that "[i]n that case the sheriff was clear[ly] engaging in jail-speak and had no intention of

actually 'hangin' the inmate. In Defendant Magera's threat, there was clearly a threat of physical harm and the Plaintiff took the threat seriously, as any normal person [would] do." (Objections ¶ 15.) While the court does not take lightly any accusations of death threats, the law clearly provides that "[e]ven extreme verbal abuse typically is insufficient to establish a constitutional deprivation." *Abeyta v. Chama Valley Indep. Sch. Dist. No. 19*, 77 F.3d 1253, 1256 (10th Cir. 1996); see also Cole v. Cole, 633 F.2d 1083, (4th Cir. 1980). Therefore, the court dismisses this claim against Magera.

## VI.  Plaintiff's Claims Against Charleston County, Charleston County Council, and McRoy Canterbury Jr.

The Magistrate Judge recommended that Plaintiff's claims against Charleston County, Charleston County Council, and McRoy Canterbury, Jr. be dismissed because Plaintiff did not make any allegation that these Defendants ever interacted with Plaintiff personally. In his Objections, Plaintiff "agrees with the magistrate." Therefore, the court dismisses Plaintiff's claims against these Defendants.

## VII.  Plaintiff's Claims Against Julie J. Armstrong, Charleston County Clerk of Court

Plaintiff alleges that Charleston County Clerk of Court Julie Armstrong "stole and embezzled" a 5% fee from his support payments and "falsely held [him] in arrears." (Am. Compl. at 9.) The Magistrate Judge concluded that Ms. Armstrong was only following a court order by collecting and distributing child support payments in Plaintiff's family court case, and as such, she is entitled to absolute quasi-judicial immunity. Thus, the Magistrate Judge recommended that Plaintiff's claims against Ms. Armstrong—that she has been "unjustly enriched" or "breached a fiduciary duty," or committed a RICO violation, or violated his civil rights should be dismissed. (R&R at 32.) Plaintiff objects to this recommendation. He clarifies that his claims against Ms. Armstrong are for "unlawful takings of money not only personally as

against the Plaintiff, but also in defiance of the federal Title IV laws." (Objections ¶ 30.) Plaintiff believes Ms. Armstrong "dipped into the child support funds and stole the 5%, thus leaving the children shortchanged. Thus breeching her fiduciary duty." (*Id.* ¶ 31.) Lastly, Plaintiff contends that "the Clerk of Court did not have jurisdiction to bill and collect <u>any</u> of the child support monies, more or less [sic] the 5% theft." (*Id.* ¶ 32.)

"There is general agreement that court officials . . . who act at the behest of a judge or pursuant to a court order are entitled to absolute quasi-judicial immunity from suit as to those actions." *Forte v. Sullivan*, 935 F.2d 1, 3 (1st Cir. 1991); *see also Rogers v. Bruntrager*, 841 F.2d 853, 856 (8th Cir. 1988) (noting that clerks have absolute immunity from actions for damages arising from acts they are specifically required to do by court order or at a judge's direction). As the Magistrate Judge noted, the doctrine of absolute quasi-judicial immunity from civil suit has been adopted and made applicable to court support personnel because of "the danger that disappointed litigants, blocked by the doctrine of absolute immunity from suing the judge directly, will vent their wrath on clerks, court reporters, and other judicial adjuncts." *Kincaid v. Vail*, 969 F.2d 594, 601 (7th Cir. 1992) (internal quotation omitted). The court adopts the Magistrate Judge's recommendation.

Clerk Armstrong was acting pursuant to statute and court order when dealing with Plaintiff's family court case. Section 63-3-370 of the South Carolina Children's Code, entitled "Fees and costs," provides:

> In actions for support for the spouse or dependent children, when paid through the court or through a centralized wage withholding system operated by the Department of Social Services and not directly, the court shall assess costs against the party required to pay the support *in the amount of five percent* of the support paid, which costs must be in addition to the support money paid. . . .

> By making the additional five percent payment on child support required by this subsection to the court or through the centralized wage withholding system operated by the Department of Social Services, the payor agrees:
>
> (1) that this payment is in satisfaction of court costs assessed;
>
> (2) *that this payment is not child support under 45 CFR 302.51 but is in addition to all child support paid*;
>
> (3) to the distribution of this payment to the State for court costs.

S.C. Code Ann. 63-3-370(C) (emphasis added). Since Plaintiff only objects to the manner in which the County Clerk's office collects and disburses child support payments, the court dismisses Plaintiff's claims against Clerk of Court Julie Armstrong, as she is entitled to quasi-judicial immunity from suit as to those actions.

## VIII.    Plaintiff's Claims Against Correct Care Solutions, LLC

Defendant Correct Care Solutions, LLC is the company that employed the medical care personnel who provided medical care at the Charleston County Detention Center. Plaintiff complains of its employees' failure to provide him constitutionally adequate care, which resulted in cruel and unusual punishment and its employees' "denial of care." (Am. Compl. at 144.) The Magistrate Judge recommended that the court dismiss Plaintiff's claims against this Defendant because he failed to identify a policy or custom of CCS that had a direct causal link to his injuries and, to the extent Plaintiff alleged a medical malpractice claim, because he failed to provide an expert affidavit with his Complaint or Amended Complaint, as required under South Carolina law. (R&R 35–36.)

In his Objections, Plaintiff clarifies that he is not alleging a medical malpractice claim; rather, he is claiming that CCS is responsible for the cruel and unusual punishment its employees made him suffer by failing to provide him with medical care. Plaintiff claims that he "could not stand or walk on his own and was dumped back onto the floor of the suicide watch room to

wither in his own pain and agony." (Objections ¶ 16.) He claims that his body was in "critical condition;" yet, CCS refused to provide medical care. (*Id.*) Although Plaintiff alleges that he was in a "deep stage 3 hypothermic coma" after being "locked in the 'freezer' for three days and five changing of the guards," (Am. Compl. at 141), he does not state the basis for his claim against CCS beyond the general assertion that CCS medical personnel failed to properly provide him medical care when he needed it and that "CCS signed their 'refusal form' to provide medical care." Plaintiff does not allege any medical personnel by name, any details as to how he attempted to seek medical treatment, and how the medical release form supports his claim. Plaintiff merely alleges that "CCS simply placed [him] on the floor to either die or live on his own accord." (Am. Compl. at 142.)

Since the court finds that Plaintiff has not alleged any facts to create a plausible claim for deliberate indifference to his serious medical needs, the court dismisses his claims against this Defendant. *Cf. Bowens v. Cannon*, 175 F. App'x 635, 636 (2006) (vacating a district court's order that granted a Correct Care Solution's motion to dismiss on Plaintiff's deliberate indifference to medical needs claim when Plaintiff alleged that medical personnel failed to properly clean and dress the surgical wound, failed to issue the prescribed antibiotics, and caused him to miss follow-up appointments at the hospital by failing to arrange for transportation.).

## IX.    Plaintiff's Claims Against Wishart Norris Henninger & Pittman, P.A. and Attorney Wade Harrison

Defendant Wishart Norris Henninger & Pittman, P.A. and Attorney Wade Harrison represent Plaintiff's ex-wife in a state court proceeding filed against Plaintiff in North Carolina. The Magistrate Judge found that the only allegation against these Defendants is asserted in count 11, entitled "August 2006–December 2007—Gathering Evidence, Harassment and Fraud by the

Firm and Wade Harrison, Writing the Book: The Public Trust: Statement of Fact." Count 11 alleges:

> Wade Harrison, a lawyer in The Firm, decided to file a false and fraudulent action against the Plaintiff. On July 27, 2007, The Firm filed action NC 07 CvD 1939 against Plaintiff. The suit, among other things, demanded $24,607.45 of false arrears left over from the South Carolina Case. Wade Harrison perpetrated a fraud upon the courts and upon the Plaintiff because there was no money [owed] from South Carolina and Wade Harrison knew that because he was the one that saw to it that any remaining balances in South Carolina were zero balanced and case SC 04-DR-10-193 was already closed. The Firm knew that the Plaintiff was a vulnerable person and proceeded to cause intentional infliction of emotional distress with full knowledge of what they were doing. The Plaintiff's father had fired the Firm and The Firm were seeking revenge via harassment with a knowingly fraudulent action.

(Am. Compl. at 146–47.) Based on this allegation, the Magistrate Judge concluded that Plaintiff simply failed to state any recognizable claim for relief and should be dismissed. (R&R at 38, 40–41). Additionally, the Magistrate Judge concluded that these Defendants did not act under color of state law as required to state a § 1983 cause of action. (R&R at 38–40.) In his Objections, Plaintiff contends "that he stated plenty of claims." (Objections ¶ 18.) He claims that Harrison tricked him into signing a stipulation that transferred his case from Pennsylvania to North Carolina, and once in the North Carolina courts, he "made up fake 'arrears' . . . and filed a clearly bogus lawsuit against the Plaintiff." (*Id.*) As such, Plaintiff argues that "Defendant Harrison violated [his] Constitutional Rights to Due Process and to that of Cruel and Unusual Punishment; all without merit." (*Id.*)

Plaintiff did not object to the Magistrate Judge's finding that Mr. Harrison and his private law firm are not state actors as required by § 1983 to assert his civil rights claims; therefore, the court adopts that recommendation and dismisses those claims. Additionally, the court also finds that Plaintiff has failed to state a claim against these Defendants that make his state law claims plausible on their face. The factual allegation that supports all of Plaintiff's state law claims

against these Defendants is that they filed a complaint seeking child support payments on behalf of Plaintiff's ex-wife, and based on this action, Plaintiff alleges "fraud," "abuse of process," "intentional infliction of emotional distress." Without more, the act of filing a complaint, even if based on falsities as alleged by Plaintiff, does not constitute a factual basis that makes Plaintiff's claims plausible on their face. Therefore, the court also dismisses Plaintiff's state law claims against these Defendants. *Young v. City of Mount Ranier*, 238 F.3d 567, 577 (4th Cir. 2001) (stating that the presence of a few conclusory legal terms does not insulate a complaint from dismissal under Rule 12(b)(6) when the facts alleged in the complaint cannot support the legal conclusion).

## X.    Plaintiff's RICO claim

Plaintiff also alleges violations arising under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c), and asserts that "[t]he Enterprise conspired . . . to racketeer . . . to cause damage to Plaintiff, his credit histories, his business and commerce, and his mental health." (Am. Comp. at 109.) Plaintiff claims that "Defendant Magera had knowledge that no child support arrears existed; yet he and his agents and actors at the SCDSS and SC, under his authority, and despite Plaintiff's multiple requests for help, intentionally carried out such racketeering activities for almost a year." (*Id.* at 110.) Plaintiff further alleges that "South Carolina never, at any time, had jurisdiction over the Pennsylvania support order. And therefore everything they did, they did without authority." (*Id.* at 113) (emphasis in original).

The Magistrate Judge recommended that this claim be dismissed because not only is "it unclear which defendants the plaintiff intended to sue under RICO," but also because "this claim is wholly conclusory and is subject to dismissal on that ground alone." (R&R at 41.) In his Objections, Plaintiff explains that "[t]he state, the DSS, the prosecutors, the state insurance

department, the judges, and others, all collude[d] together for the mutual destruction of [him]."
(Objection ¶ 19.) Plaintiff also claims in his Objections that "DSS even has it rigged where a
family court judge cannot dispose of a case unless the DSS signs off on the matter. Further, the
DSS (Executive Branch) computers are tied directly into the judicial (Judicial Branch) computer
case management network." (*Id.* ¶ 21.) According to Plaintiff, "[a]ll parties named as defendants
played a role in a calculated effort to destroy the Plaintiff; personally and professionally. When
those efforts failed to cause the Plaintiff to give up on justice, they boastfully worked in concert
to try to murder the Plaintiff." (*Id.* ¶ 22.) Based on these allegations, Plaintiff believes he has
sufficiently pleaded a RICO claim, but since he is proceeding pro se, he "believes the courts have
to actually climb inside his head and formulate the legal claim based on what he means." (*Id.* ¶
26.)

In addressing the Racketeer Influenced and Corrupt Organizations Act (RICO), the
United States Supreme Court stated the following:

> RICO, which gives civil remedies to any person injured in his business or
> property by reason of a violation of 18 U.S.C.S. § 1962. Title 18 U.S.C.S. §
> 1962(c) makes it a crime for any person employed by or associated with any
> enterprise engaged in, or the activities of which affect, interstate or foreign
> commerce, to conduct or participate, directly or indirectly, in the conduct of such
> enterprise's affairs through a pattern of racketeering activity. RICO defines
> "racketeering activity" to include any act which is indictable under the Hobbs Act
> as well as any act or threat involving extortion which is chargeable under state
> law and punishable by imprisonment for more than one year. The Hobbs Act,
> finally, criminalizes interference with interstate commerce by extortion, along
> with attempts or conspiracies, § 1951(a), extortion being defined as the obtaining
> of property from another, with his consent, induced by wrongful use of actual or
> threatened force, violence, or fear, or under color of official right.

*Wilkie v. Robbins*, 551 U.S. 537, 563 (2007) (internal citations omitted). After considering
Plaintiff's Objections, the court agrees with the Magistrate Judge's recommendation that Plaintiff

has failed to state a RICO claim that is plausible on its face. In *Ashcroft v. Iqbal*, the United

States Supreme Court stated:

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw ***the reasonable inference*** that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

129 S. Ct. 1937, 1949 (2009) (emphasis added). It would be unreasonable for the court to accept

as true that the "state, DSS, the prosecutors, the state insurance department, the judges, and

others, all collude together for the mutual destruction" of Plaintiff. (Objections ¶ 19.) Moreover,

the factual allegations made by Plaintiff—that DSS controls when a family court judge can

dismiss a case and that DSS and the judiciary share the same "computer case management

network"—do not render Plaintiff's RICO claim plausible. Finally, Plaintiff has failed to plead

any factual basis to support a claim that the Defendants conspired to "murder" him. The

remaining allegations in Plaintiff's Objections—such as, "[t]hrough a systematic pattern of

behavior[,] the collective enterprise built of the various named private and public entities, all

parties did enrich their operation (such as the state and county, and/or persons) through a

cooperative deprivation of their captive's civil rights," and that "[a]ll parties named as

defendants played a role in a calculated effort to destroy the Plaintiff; personally and

professionally"—are conclusory allegations that do not amount to anything more than bare

assertions. Therefore, the court dismisses Plaintiff's RICO claim for failing to state a claim to

relief that is plausible on its face.

**XI.**   **Plaintiff's Claims Asserted Under Criminal Statutes**

Plaintiff seeks relief from various defendants pursuant to various criminal statutes, including 18 U.S.C. § 1113 for murder, 18 U.S.C. § 1117 for conspiracy to murder, and 18 U.S.C. § 240 for criminal deprivation of rights under color of law, and for "criminal conspiracy." The Magistrate Judge recommended that these claims be dismissed, as Plaintiff does not enjoy a private right of action under criminal statutes. Plaintiff did not object to the Magistrate Judge's recommendation on this matter. Therefore, the court is not required to give any explanation for adopting these recommendations. *See Camby v. Davis*, 718 F.2d 198, 199 (4th Cir. 1983).

## CONCLUSION

Based on the foregoing, it is **ORDERED** that the claims brought on behalf of Plaintiff's minor children be **DISMISSED** form this suit, *without prejudice*, and that Plaintiff's minor children be **DISMISSED** as plaintiffs. It is further **ORDERED** that all of Plaintiff's claims be **DISMISSED**, except those claims asserted against Defendant Sheriff James Al Cannon in his individual capacity. It is further **ORDERED** that Defendants' Motion for a Protective Order is rendered **MOOT**.

**AND IT IS SO ORDERED.**

PATRICK MICHAEL DUFFY
United States District Judge

**September 30, 2009**
**Charleston, SC**