## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| David A Bardes, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No.: 2:08-487-PMD |
| v. | ) | |
| | ) | |
| | ) | |
| James A. Cannon, Jr., | ) | **ORDER** |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This matter is before the court on Plaintiff David A. Bardes'("Plaintiff") objections to the

Report and Recommendation ("R&R") of a United States Magistrate Judge. The Magistrate Judge

recommended that Defendant's motion for summary judgment be granted and that Plaintiff's claims

be dismissed. Having reviewed the entire record, including Plaintiff's objections, the court finds the

Magistrate Judge fairly and accurately summarized the facts and applied the correct principles of

law.  Accordingly, the court adopts the R&R and fully incorporates it into this Order.

### BACKGROUND

In April of 2006, Plaintiff was sentenced to six months imprisonment in the Charleston

County Detention Center for failure to pay child support. Plaintiff claims that he was kept in a

holding cell for three days, which was a "cold cell," and that the holding cell had a large vent and

a booster fan that would accelerate "super chilled" air into the room. He further claims that he was

without water, food, bedding or clothing during this time. In his amended complaint, Plaintiff states:

> Within approximately 8-12 hours Plaintiff had fallen into a
> stage 3 hypothermic shock; Plaintiff had informed a Jailer-Defendant
> that Plaintiff was hypothermic by stating that his body was unable to
> shiver to keep itself with heat.  Plaintiff asked the Jailer-Defendant to
> notify the nurse. The Jailer-Defendant replied, "I will do no such
> thing."

> Plaintiff suffered tremendous pain, slow loss of use of limbs, violent shivering, painful muscle stiffening, the horror and fright that death was imminent, and the realization that Defendant Magera and Defendant Garfinkel planned his death so quickly and by means of severe hypothermia leading to death by heart failure or brain death, whichever came first.
>
> Within approximately 8-12 hours, Plaintiff's brain began to shut down and Plaintiff suffered increasing memory loss until he lost all thought and lost consciousness. Plaintiff slipped into an unconscious hypothermic coma. Plaintiff believed he died.

(Am. Compl.)

Plaintiff further alleges that on April 5, 2006 he was removed from the cold holding cell and placed on a blanket by unknown persons and was beaten by a new guard staff that was unaware of the his prior ordeal. The new guard staff eventually realized something was wrong, at which point he was taken to the jail's hospital, where he was placed on suicide watch. He claims that he was "wracked with agonizing pain and was suffering from ventricular tachacardia" as his body warmed. (*Id.*.) Plaintiff further claims that on April 6, 2006, the doctor realized Plaintiff was in danger of death and told the Plaintiff that he would get help. He was asked to complete a form asking for certain medical information about him, but he refused to sign it because he could not read the form and the jailers refused to give him his glasses. Plaintiff alleges the medical staff filled out a "refusal of medical treatment" form and left him in the suicide-watch room for six days with no blanket.

As against Defendant Sheriff Cannon, Plaintiff claims that he is vicariously liable for the jailers conduct of torturing him by placing him in a cold holding cell and leaving him there for three days without medical attention. After considering Plaintiff's argument, the Magistrate Judge recommends the court to grant Defendant's motion for summary judgment. Plaintiff's objections to this recommendation are before the court.

**STANDARD OF REVIEW**

**A.      Magistrate Judge's R&R**

The Magistrate Judge made his review in accordance with 28 U.S.C. § 636(b)(1)(B) and

Local Civil Rule 73.02. The Magistrate Judge only makes a recommendation to the court. It has no

presumptive weight, and the responsibility for making a final determination remains with the court.

*Mathews v. Weber*, 423 U.S. 261, 270–71 (1976). Parties are allowed to make a written objection

to a Magistrate Judge's report within fourteen days after being served a copy of the report. 28 U.S.C.

§ 636(b)(1). From the objections, the court reviews *de novo* those portions of the R&R that have

been specifically objected to, and the court is allowed to accept, reject, or modify the R&R in whole

or in part. *Id.* Additionally, the court may recommit the matter to the Magistrate Judge with

instructions. *Id.*

**B.      Legal Standard for Summary Judgment**

To grant a motion for summary judgment, the court must find that "there is no genuine issue

as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ.

P. 56(c). The judge is not to weigh the evidence, but rather to determine if there is a genuine issue

of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). If no material factual

disputes remain, then summary judgment should be granted against a party who fails to make a

showing sufficient to establish the existence of an element essential to that party's case, and on

which the party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). All

evidence should be viewed in the light most favorable to the non-moving party. *Perini Corp. v.*

*Perini Constr., Inc.*, 915 F.2d 121, 123–24 (4th Cir. 1990). The court remains mindful of the fact that

*pro se* complaints are held to a less stringent standard than those drafted by attorneys, *Gordon v.*

*Leeke*, 574 F.2d 1147, 1151 (4th Cir. 1978), and a federal district court is charged with liberally

construing a complaint filed by a *pro se* litigant to allow the development of a potentially meritorious

case. *See Hughes v. Rowe*, 449 U.S. 5, 9 (1980). The requirement of liberal construction, however,

does not mean that the court can ignore a clear failure in pleading to allege facts which set forth a

claim currently cognizable in a federal district court. *Weller v. Dep't of Soc. Servs.*, 901 F.2d 387

(4th Cir. 1990).

## ANALYSIS

In his R&R, the Magistrate Judge recognized the general rule that "the doctrines of vicarious

liability or respondeat superior do not operate in § 1983 claims," and that "[a]bsent a showing that

the sheriff's action or inaction was affirmatively causally linked to the alleged unconstitutional

behavior in the sense that it could be characterized as supervisory encouragement, condonation, or

acquiescence or gross negligence amounting to deliberate indifference, no liability can accrue" to

Sheriff Cannon. (R&R at 9.) Ultimately, the Magistrate Judge determined that Sheriff Cannon is

entitled to judgment as a matter of law because "there is no evidence of any individual wrongdoing

or potential supervisory liability for anyone else's wrongdoing on the part of Sheriff Cannon," and

merely because he "holds the position of Sheriff of Charleston County alone is clearly not sufficient

[to] sustain a viable supervisory liability claim against him." (*Id.* at 10.)

In his objections, Plaintiff contends that Sheriff Cannon created the policy of having a "cold

cell" in the booking area, and he further implies that Defendant controlled the temperature to the cold

holding cell because the thermostat is locked and none of the jailers had a key to access it. (*See, e.g.*,

Objections ¶¶ 6, 19, 72.) While he believes the jailers were only trying to torture him, rather than kill

him, he asserts that Sheriff Cannon, as a sheriff and a lawyer, should have known that the cold could

4

kill him, (*see, e.g.*, *id.* ¶¶ 12, 64), and as such, he claims that Sheriff Cannon subjected him to cruel

and unusual punishment in violation of his constitutional rights by creating a policy that forced him

to remain in this cold holding cell for three days without blankets or medical attention. (*See, e.g.*, *id.*

¶¶ 14, 19, 24, 34, 40 59, 64.)

It is clear from Plaintiff's pleadings and objections that his claim against Sheriff Cannon is

based on the theory of supervisory liability, as he does not allege that Sheriff Cannon personally

placed him in the "cold cell" or that he ever ordered Plaintiff to be placed in any particular holding

cell. (Objections ¶ 19) ("But the sheriff was not the one that put me in the cold cell for three days,

his jailers did that. . . . But Sheriff Cannon is responsible for his jailers by law."). "It is well settled

that 'supervisory officials may be held liable in certain circumstances for the constitutional injuries

inflicted by their subordinates.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting

*Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994)). In order to establish supervisory liability under

§ 1983, a plaintiff must demonstrate:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was
> engaged in conduct that posed a pervasive and unreasonable risk of constitutional
> injury to citizens like the plaintiff; (2) that the supervisor's response to that
> knowledge was so inadequate as to show deliberate indifference to or tacit
> authorization of the alleged offensive practices; and (3) that there was an affirmative
> causal link between the supervisor's inaction and the particular constitutional injury
> suffered by the plaintiff.

*Baynard*, 268 F.3d at 235 (quoting *Shaw*, 13 F.3d at 799). To satisfy the requirements of the first

element, a plaintiff must show the following: "(1) the supervisor's knowledge of (2) conduct

engaged in by a subordinate (3) where the  conduct poses a pervasive and unreasonable risk of

constitutional injury to the plaintiff." *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (citation

omitted). "Establishing a 'pervasive' and 'unreasonable' risk of harm requires evidence that the

conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury." *Id.* (citation omitted).

To satisfy the requirements of the first element, Plaintiff suggests that Sheriff Cannon controlled the temperature in the "cold cell," because the thermostat on the wall was locked, preventing the jailers from controlling it. To further support this implication, Plaintiff provided the court with a very blurry picture of what he claims to be a thermostat in the detention center, which is locked behind a case. As already discussed, Plaintiff believes he has shown deliberate indifference on the part of Sheriff Cannon because he believes Sheriff Cannon should have known, being a sheriff and a lawyer, that an extended placement in a cold cell would kill him. Lastly, Plaintiff claims that Sheriff Cannon's policy of maintaining a "cold cell" in "sub-human conditions," caused him to slip into a hypothermic coma and "die a conscious death." After carefully considering Plaintiff's objections, the court agrees with the Magistrate Judge's recommendation and finds that Sheriff Cannon is entitled to judgment as a matter of law with respect to Plaintiff's claims against him.

Most notably, Plaintiff has failed to offer any credible proof that he was housed in a cell that was maintained at an extremely low temperature, let alone proof that Sheriff Cannon approved the use of a "cold cell" to torture certain inmates. Sheriff Cannon provided the affidavit of Mitch Moye, the Facility Maintenance Manager for Charleston County, who works with the HVAC system at the Charleston County Detention Center. He attested to the fact that, during the time in question, the detention center used an energy management system, which set the temperature range in the facility from a set point of 74 degrees to a set point of 76 degrees. (Def. Mot. Summ. J. Ex. 9 ¶¶ 1–2.) If a cell were to get too cold, a power induction unit "closes down the damper for the particular cell to

20% and a hot water valve is opened up to warm the room to the set point." (*Id.* ¶ 3.) In fact, Mr. Moye further attested to the fact that at the time in question, "the larger HVAC units for the Detention Center had not yet been installed," and as such, it was "having problems cooling the booking areas mentioned by Mr. Bardes." (*Id.* ¶ 5.) To alleviate the problem, the detention center "brought in portable air conditioning units to help cool the are to the proper set point." (*Id.*) This fact was corroborated by the testimony of Thomasina Dyer, who worked as an ID tech in booking at the time in question. (Def. Mot. Summ. J. Ex. 8.) She testified during her deposition that she remembers being hot and sweating in April of 2006 because the detention center did not have any air at that time. (Dyer Dep. p. 13:14–15.) She also recalled that the jail used portable air conditioners in the booking area to help cool it down and that a fan was used in conjunction with the portable air conditioners to help blow the cooler air around the area. (*Id.* 13:16–20.) Finally, Ms. Dyer testified that she was not aware of any kind of cold cell where difficult detainees would be placed for punishment. (*Id.* 13:21–14:5.) Sheriff Cannon also provided the court with the deposition testimony of Dr. Ralph B. Piening, who worked at the detention center at the time in question and actually treated Plaintiff on April 6, 2006. (Def. Mot. Summ. J. Ex. 6.) According to Dr. Piening, he never treated any inmate for hypothermia or for coldness; he never heard any prisoners complain about a "cold cell"; he never recalled seeing any medical evidence that demonstrated Plaintiff was hypothermic; and that on April 6, 2006, he did not observe any physical injuries to Plaintiff, and besides asthma and a mental health problem, he did not discuss any other health problems with Plaintiff. (Dr. Piening Dep. pp. 4–12.).

Based on this record, Plaintiff has not shown that any subordinate of Sheriff Cannon's was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury. Even if

7

Plaintiff had offered credible evidence that he was tortured through the use of a cold cell, he has not

shown that it was a pervasive problem or that Sheriff Cannon knew of the conduct, acquiesced to

it, or in any way exhibited a deliberate indifference to such a situation. Simply because Sheriff

Cannon is the sheriff and the thermostat is locked does not show that he controlled the temperature

in a particular holding cell. As such, the court grants Sheriff Cannon's motion for summary judgment

with respect to Plaintiff's claims against him in his personal capacity. *Shaw v. Stroud*, 13 F.3d 791,

799 n.12 (4th Cir. 1994) ("In practical terms, it should be noted that a showing of a pervasive and

unreasonable risk of harm is also necessarily a component of establishing either 'deliberate

indifference' or 'tacit authorization.' ). The court also notes that Sheriff Cannon cannot be held liable

under Section 1983 in his official capacity. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58,

71 (1989) ("We hold that neither a state nor its officials acting in their official capacities are

'persons' under § 1983."); *see also Gulledge v. Smart*, 691 F. Supp. 947 (D.S.C. 1988) *aff'd* 878

F.2d 379 (4th Cir. 1989) (holding that, in South Carolina, sheriffs and deputies are state officials).

## CONCLUSION

Based on the foregoing, the court **GRANTS** Defendant Sheriff James A. Cannon, Jr.'s

motion for summary judgment.

**AND IT IS SO ORDERED.**

_____
PATRICK MICHAEL DUFFY
United States District Judge

**August 9, 2010**
**Charleston, SC**

8